ESTATE OF THOMAS C. RUSSELL, DECEASED, FLORENCE D. RUSSELL, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6282–76.    Filed April 17, 1978.

*Leslie R. Bishop,* for the petitioner.
*James F. Hanley, Jr.,* for the respondent.

RAUM, *Judge:* The Commissioner determined a deficiency in petitioner's Federal estate tax in the amount of $113,688.51. Concessions having been made by both parties, the principal issue is whether certain charitable contributions made by decedent in the 3-year period prior to his death are includable in

his gross estate pursuant to section 2035, I.R.C. 1954. Resolution of this issue will automatically determine the amount of the marital deduction to which the estate is entitled.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

Thomas C. Russell died testate on July 10, 1972, at the age of 84. His will was submitted to probate in Probate Division of the Circuit Court of Cook County, Ill., and Florence D. Russell of Chicago, Ill., his widow, was appointed executor of the estate.

Florence as executor of decedent's estate filed a Federal estate tax return for the estate with the District Director, Internal Revenue Service, Chicago, Ill., on April 10, 1973. At the time the petition in this case was filed, Florence resided in Chicago, Ill.

Prior to 1961, decedent was the owner of 200 shares of the Wrap-On Co., Inc., which constituted all of the outstanding shares of that corporation's stock. Between 1961 and 1964, decedent gave 96 shares of this stock to the Tom Russell Charitable Foundation, Inc. (the Russell Foundation), but retained the remaining 104 shares. Decedent was president of the Wrap-On Co. until his death, after which he was succeeded as president by his wife, Florence.

Decedent executed his will on May 23, 1967. In substance, he left $25,000 to his son and grandchildren and the remainder of his probate estate to his wife, Florence, provided she survive him. (All other heirs were specifically disinherited.) In the event Florence failed to survive him, he left the remainder to Northwestern University. By codicil dated February 11, 1972, decedent changed the contingent remainderman from Northwestern University to the Russell Foundation.[1]

Also on May 23, 1967, decedent created the Thomas C. Russell Trust (the Russell Trust) and contributed thereto as corpus his 104 shares of Wrap-On Co., Inc., stock. The Russell Trust was revocable; decedent was the original trustee while Florence was

---

[1] The Russell Foundation's right to take was conditioned upon its remaining at that time an exempt organization pursuant to Federal internal revenue laws. Otherwise the contingent remainder was to pass to the Chicago Community Trust.

the named successor trustee. The trust provided that decedent should receive the income for life and that Florence, if she survived him, should then receive the income for life. The remainder was to pass to the Russell Foundation. The trustee was required to pay any estate taxes attributable to the inclusion of the trust corpus in decedent's taxable estate.

On July 23, 1970, decedent amended the Russell Trust to provide that, upon the settlor's death, the trust corpus be divided into two parts, one a marital trust funded only to the extent necessary to secure the decedent's estate the maximum marital deduction allowable, and the second a nonmarital trust, which was to receive the balance of the trust assets and was to bear any estate taxes resulting from the inclusion of the trust assets in decedent's estate. Florence was to receive the income of the marital trust for life, a limited power to invade its corpus, and a power of appointment over its corpus. The income of the nonmarital trust was to go to Florence for her life, and thereafter to certain employees of the Wrap-On Co. A second amendment to the trust, dated February 26, 1972, changed the income beneficiary of the nonmarital trust (following Florence's life estate) to the Wrap-On Co. profit-sharing trust. In the event the Wrap-On Co. should cease to be an identifiable business organization, the remainder of the nonmarital trust was to pass to the Russell Foundation.

On September 28, 1968, decedent entered the Chicago Wesley Memorial Hospital complaining of fatigue, lack of appetite, and a 60-pound weight loss in the previous 6 months. He was diagnosed as having cancer of the prostate which had spread to bone. In December 1968 decedent suffered a fracture of the hip which resulted, in part, from a weakening of the bone caused by the spread of the cancer. Decedent was given a hip socket replacement and for a while could walk with the aid of two canes. By early 1969, however, he was permanently confined to a wheel chair. Beginning in 1969, he received radiation and hormone treatments on an outpatient basis at the Illinois Masonic Medical Center, and in addition he was admitted to that hospital at least four times during 1970 and 1971 for blood transfusions and other treatments necessitated by the spread of his prostate cancer. In April 1970 surgery was performed at the Illinois Masonic Medical Center for the removal of his testes. Decedent's health deteriorated to the point that home care was

no longer adequate and so in February 1972 he was admitted to the Illinois Masonic Medical Center, where he remained until his death of cancer on July 10, 1972, at the age of 84. He was terminally ill throughout the 3-year period immediately preceding his death.

Decedent remained lucid and in good spirits until the final weeks of his life. Nonetheless, he was aware of the seriousness of his condition. In the spring of 1970 he was taken by ambulance to his summer home in Wisconsin some 100 miles away, and, upon returning in the fall of 1970, again by ambulance, he told his wife that he wondered if he would ever see the summer home again.

During the 3-year period preceding his death, decedent made the following charitable contributions:

| Date of contribution | Charity | Amount |
|---|---|---|
| 12/69 | Tom Russell Charitable Foundation | $17,000 |
| 12/69 | Illinois Masonic Hospital | 15,000 |
| 1970 | United Settlement Appeal | 50,000 |
| 1970 | Illinois Masonic Medical Center | 26,000 |
| 1970 | Rockford College | 5,000 |
| 1971 | George Williams College | 2,000 |
| 5/71 | Illinois Masonic Medical Center | 3,500 |
| 9/71 | Illinois Masonic Medical Center | 15,000 |
| 11/71 | St. John's Military Academy | 5,000 |
| 12/71 | Illinois Masonic Medical Center | 65,000 |
| | | 203,500 |

All of the above noted contributions were in cash except for the $17,000 contribution to the Russell Foundation in 1969, which was a mortgage note previously acquired by decedent. Decedent and his wife claimed deductions for all of these charitable contributions in their joint Federal income tax returns for the years 1969 through 1972, thereby reducing their taxable income by $203,500. By reason of these deductions, decedent and his wife reduced their total tax liability for the years 1969–72 by $123,273.

At the time of decedent's death on July 10, 1972, the 104 shares of stock in the Wrap-On Co. which he had transferred to the Russell Trust had a fair market value of $728,000. The assets of decedent's probate estate had a value on that date of approximately $435,000.

On Schedule G of decedent's Federal estate tax return

Florence included as assets of decedent's gross estate each of the 10 charitable contributions made by decedent in the last 3 years of his life, in the total amount of $203,500. The Commissioner determined that the 10 charitable contributions were not includable in decedent's gross estate, and that the estate was not entitled to any charitable contributions deduction on account of said 10 predeath contributions. A consequence of the elimination of these charitable gifts from the gross estate was a reduction in the amount of the marital deduction.

## OPINION

Hovering in the background of this case is the marital deduction. Although the issues have been framed in terms of whether the decedent's charitable gifts were made in contemplation of death within section 2035, I.R.C. 1954, it is the computation of the marital deduction that is in fact the principal matter that is central to this litigation. Ordinarily, it would be of no practical consequence whether gifts to qualifying charities were made in contemplation of death, since the charitable deduction relating to such gifts would offset the corresponding amount that might conceivably be included in the gross estate. But what would generally be merely a matter of academic speculation is now critical in the present case. By eliminating from the gross estate the charitable gifts made by the decedent during the last 3 years of his life, the Commissioner can automatically reduce the amount of the marital deduction (which is limited to one-half the adjusted gross estate, sec. 2056(c)(1), I.R.C. 1954). In order to prevent the reduction in estate taxes resulting from the increased marital deduction which follows from including the charitable gifts in the gross estate, the Commissioner argues primarily that the gifts were not in fact made in contemplation of death. Petitioner, relying upon section 2035 and the evidence reflected in our findings, urges that these gifts were properly included in the gross estate. We hold for petitioner.

Section 2035(a), as it was in effect at the time of decedent's death in 1972, provided for the inclusion in the gross estate of transfers made "in contemplation of death,"[2] and section 2035(b)

---

[2]All references to the Internal Revenue Code of 1954 are to the Code as applicable to decedents dying in 1972. Sec. 2035 was substantially amended by the Tax Reform Act of 1976, Pub. L. 94–455, 90

provided further that a transfer within 3 years of death "shall, unless shown to the contrary, be deemed to have been made in contemplation of death." The fact that the gifts herein, totaling $203,500, were made within 3 years of the decedent's death triggered the operation of section 2035(b), and the principal issue presented for our consideration is whether the evidence justifies a determination that the gifts were not in fact made in contemplation of death. The criteria to be taken into account in making such a factual determination were discussed in *United States v. Wells*, 283 U.S. 102. And although there is some support in the evidence for the Government's position, we conclude that on the whole the scales tip in petitioner's favor.

The decedent was terminally ill as early as 1968. His prostatic cancer had spread to his bone structure, and by December 1968, that pathologic condition resulted in a fracture requiring the insertion of a socket in his hip. By early 1969 he was permanently confined to a wheelchair. He was in and out of hospitals on a number of occasions, and by April 1970 an orchiectomy had to be performed. He was able to go to his summer home, some 100 miles away, only by ambulance, and upon returning in the fall, again by ambulance, he expressed doubt whether he would ever see that summer home again. The decedent was alert, and although there is no direct evidence that the precise nature of his illness was communicated to him, the inference from the evidence before us is irresistable that the decedent, a man in his 80's, was aware of the seriousness of his condition. Cf. *Bassett's Estate v. Commissioner*, 170 F.2d 916, 917 (2d Cir.), certiorari denied 336 U.S. 945. That the recipients of the gifts were charitable institutions rather than members of decedent's family, and that the decedent may have been motivated in part by a desire to obtain income tax advantages by the gifts are certainly factors to be taken into account. But, upon a consideration of all the evidence, it is our best judgment that the gifts may properly be classified as having been made in contemplation of death, and we so find as a fact.

If, instead of making these gifts, the decedent had provided in

---

Stat. 1520, applicable to the estates of decedents dying after Dec. 31, 1976. In particular, sec. 2035 was amended to provide for the inclusion in the gross estate of *all* transfers made during the 3-year period ending on the date of decedent's death. Under the statute as amended, therefore, there can no longer arise a factual question as to whether a transfer was made "in contemplation of death."

his will for identical gifts to the same charitable donees, the amounts involved (although deductible for purposes of determining the taxable estate) would undoubtedly have been reflected in his gross estate, and petitioner would have been entitled to the identical marital deduction which it now claims. What is perhaps really troublesome to the Government is that the same gifts in this case provided income tax benefits as well as estate tax benefits. This situation may indeed reveal a loophole in the statute that could call for legislative correction. But that is not a matter that is properly before us. Based upon our finding that the gifts were made in contemplation of death, they must be included in the gross estate, the marital deduction must be computed accordingly, and the amount of the gifts is deductible under section 2055.

*Decision will be entered under Rule 155.*